**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JERRY GORALSKI LAMB,<br><br>                *Plaintiff*,<br><br>        v.<br><br>MILLENNIUM CHALLENGE<br>CORPORATION, *et al.*,<br><br>                *Defendants*. | Civil Action No. 19-589 (RDM) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jerry Goralski Lamb worked for about two months in 2016 as a "personal services contractor" with the Millennium Challenge Corporation (the "MCC"), a federal agency that does foreign aid work. When he started the job, Plaintiff thought that his background check was already complete. But a couple of weeks after he started, someone from the Department of State came to interview Plaintiff as part of his apparently ongoing background investigation. A few weeks later, Plaintiff was abruptly fired without explanation. To get to the bottom of the matter, Plaintiff filed requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a, seeking records related to his firing. He obtained the relevant documents in a separate action. Armed with the information he acquired, Plaintiff then filed this action, against the MCC and agency official James Blades (collectively, "Defendants"), challenging his termination and subsequent debarment under the due process clause of the Fifth Amendment and the Privacy Act. Defendants move to dismiss the complaint.

For the reasons explained below, the Court will **GRANT** in part and **DENY** in part Defendants' motion to dismiss, Dkt. 21.  The Court will also **GRANT** Plaintiff's motion for leave to amend his response, Dkt. 26.

## I.  BACKGROUND

Much of the background of this case is described in the Court's trilogy of opinions in Plaintiff's prior lawsuit seeking records related to his termination.  *See Lamb v. Millennium Challenge Corp.*, 228 F. Supp. 3d 28, 33–35 (D.D.C. 2017) ("*Lamb I*"); *Lamb v. Millennium Challenge Corp.*, 334 F. Supp. 3d 204, 209–210 (D.D.C. 2018) ("*Lamb II*"); *Lamb v. Millennium Challenge Corp.*, Civil Action No. 16-765 (RDM), 2019 WL 4141868, at *1–2 (D.D.C. Aug. 30, 2019) ("*Lamb III*").  The Court repeats those allegations that are relevant to the claims Plaintiff brings in the present lawsuit, along with Plaintiff's new allegations.  The Court assumes the truth of those allegations for purposes of resolving Defendants' motion to dismiss for failure to state a claim.  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).  The Court goes beyond Plaintiff's allegations, however, for purposes of resolving Defendants' motion to dismiss for lack of jurisdiction.  *Id*.

In November 2015, Plaintiff applied and was later hired for a position at Sawdey Solutions Services, Inc., which served as a contractor for the MCC.  *Lamb I*, 228 F. Supp. 3d at 33.  The job required that Plaintiff "augment" MCC employees as a "personal services contractor."  *Id*. at 34.  The MCC is a corporation established in the executive branch of the federal government.  *See* 22 U.S.C. § 7703(a).  It is authorized to provide foreign assistance to countries that enter a compact with the United States setting forth a plan for "achieving shared development objectives."  *Id*. § 7708(a).  The MCC "may contract with individuals for personal

services, who shall not be considered [f]ederal employees for any provision of law administered by the Office of Personnel Management." *Id*. § 7713(a)(8).

Plaintiff's new job required a favorable background check. Dkt. 1 at 3 (Compl. ¶ 7). After filling out the requisite forms, he started work on February 22, 2016, thinking that he had already received the necessary approval. *Id*. (Compl. ¶¶ 7–8). But a couple of weeks later, sometime in March, MCC "security" contacted Plaintiff and told him that a contractor from the Department of State needed to interview him as part of the background investigation. *Id*. (Compl. ¶ 8). The Department of State, which at times assists MCC with background checks, proceeded to conduct Plaintiff's background check. *Id*. (Compl. ¶ 9). When Plaintiff came to work on April 18, 2016, MCC officials confiscated his government identification, removed him from the premises, and terminated his employment. *Id*. Later, Plaintiff learned from his direct employer, Sawdey, which held the contract with MCC, that he was terminated because his "security check came back unfavorable." *Id*.

To get to the bottom of what happened, Plaintiff requested "copies of all information maintained about himself" from the MCC and, when the agency failed to timely respond, he sued the MCC for the release of the records under FOIA and the Privacy Act. *Id*. at 4 (Compl. ¶ 11); *Lamb II*, 334 F. Supp. 3d at 209. The MCC and the State Department eventually released the records Plaintiff sought, with a few redactions, *see Lamb II*, 334 F. Supp. 3d at 210, and the Court closed the case in January 2020 when the defendants in that case "voluntarily provided Plaintiff with the sole remaining documents in dispute." *Lamb v. Millennium Challenge Corp.*, No. 16-cv-765 (D.D.C. filed April 26, 2016) (Minute Order (Jan. 23, 2020)) (entering final judgment and closing the case).

During the pendency of his prior suit, Plaintiff sought to amend his complaint to add, *inter alia*, substantive challenges to his termination. *See id.* (Nov. 21, 2016) (Dkt. 41-1) (third motion to amend). In *Lamb I*, the Court denied leave to amend with respect to several of Plaintiff's proposed claims on the ground that amendment as to those claims would have been futile. *Lamb I*, 228 F. Supp. 3d at 39–47. But the Court granted Plaintiff leave to add three due process claims against James Blades, an MCC official responsible for contracts, alleging that Plaintiff's termination violated the Fifth Amendment. *Id.* at 42–43. Plaintiff promptly filed a second amended complaint adding three due process claims against Blades. *Lamb v. Millennium Challenge Corp.*, No. 16-cv-765 (Jan. 13, 2017) (Dkt. 50). But a month later, Plaintiff voluntarily dropped those due process claims. *Id.* (Feb. 15, 2017) (Dkt. 53).

Based on the records he obtained in that prior litigation, Plaintiff learned additional facts related to his termination. As part of the background investigation, the State Department provided the MCC with a "robust and detailed" Report of Investigation ("ROI") that Plaintiff contends "ended under favorable conditions." *Id.* at 5 (Compl. ¶ 19). Ostensibly based on that ROI, the MCC then created an "Adjudication Worksheet" that listed four "issues" that arose during the background investigation. *Id.* (Compl. ¶¶ 16–17); Dkt. 23-5. The issues listed on the form were that Plaintiff (1) was removed from the Naval Air Systems Command Facility for being absent without leave; (2) had been given a one-day suspension for "[f]ailure to follow an instruction and to promote the efficiency of the service;" (3) was delinquent on a credit card bill; and (4) had sought psychological treatment. Dkt. 23-5 at 1. The comments section of the worksheet noted that the ROI "did not yield any additional information on the issues raised." Dkt. 1 at 5 (Compl. ¶ 18); Dkt. 23-5 at 1. At the bottom of the form, the "length of proposed debarment" is listed as 36 months, but the "final action" is listed as "unfavorable determination,"

rather than "agency debarment as proposed." Dkt. 23-5 at 1. The MCC gave Plaintiff no opportunity to contest or correct these findings, Dkt. 1 at 4 (Compl. ¶ 10), all of which Plaintiff alleges are incorrect or misleading, *id.* at 5 (Compl. ¶ 17). According to Plaintiff, the MCC debarred him for 36 months. *Id.* at 3 (Compl. ¶ 9). His subsequent attempts to obtain employment with either Sawdey or the MCC have all been unsuccessful, as have his efforts to obtain any other job. *Id.* at 3–4 (Compl. ¶ 9); Dkt. 23-3 (Plaintiff's job search log).

On March 4, 2019, Plaintiff filed this lawsuit against the MCC and Blades challenging his termination. Dkt. 1. Plaintiff asserts four due process claims similar to the ones he withdrew in the prior action, as well as two additional claims under the Privacy Act, and possibly other claims too, depending on how liberally one reads the complaint. *Id.*

Now before the Court are Defendants' motion to dismiss, Dkt. 21, Plaintiff's opposition, Dkt. 23, Defendants' reply, Dkt. 25, and Plaintiff's motion to correct his opposition, Dkt. 26.

## II. LEGAL STANDARDS

Although pleadings by *pro se* litigants are "held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), they must still comply with the Federal Rules of Civil Procedure, *see Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987). "Federal Rule of Civil Procedure 8(a) requires that a complaint contain a short and plain statement of the grounds upon which the Court's jurisdiction depends, a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief the pleader seeks." *Shipman v. Amtrak*, Civil Action No. 19-04 (RDM), 2019 WL 4889246, at *1 (D.D.C. Oct. 3, 2019) (citing Fed. R. Civ. P. 8(a)). The Rule is designed to "give the defendant notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal punctuation and citation omitted).

A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to hear a claim and may raise a "facial" or a "factual" challenge to the Court's jurisdiction. *See Hale v. United States*, No. 13-1390 (RDM), 2015 WL 7760161, at \*3–4 (D.D.C. Dec. 2, 2015). A facial challenge asks whether the plaintiff has alleged facts sufficient to establish the Court's jurisdiction, *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006), while a factual challenge asks whether "the complaint [as] supplemented by undisputed facts evidenced in the record, or the complaint [as] supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts" establish that the Court has jurisdiction, *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). The plaintiff bears the burden of establishing that the Court has subject matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although "detailed factual allegations" are not required, the complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me allegation." *Id.* (quoting *Twombl*y, 550 U.S. at 555). In assessing a Rule 12(b)(6) motion, a court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

6

### III.  ANALYSIS

**A.    Due Process Claims (Counts I–IV)**

To succeed on a procedural due process claim, Plaintiff must first show a deprivation of "life, liberty, or property" and must then show that "the procedures used by the Government in effecting the deprivation [did not] 'comport with due process.'" *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).  In evaluating whether governmental procedures meet the constitutional minimum set by the due process clause, the Court must consider (1) the private interest; (2) "the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) the governmental interest.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Plaintiff's complaint presents his claims under the due process clause of the Fifth Amendment in four separate, albeit overlapping, counts.  He alleges that Defendants violated his due process rights by (1) withholding "information regarding the reason for his removal from the federal contract," Dkt. 1 at 7; (2) terminating him without following the procedures for "suitability determinations" outlined in 5 C.F.R. § 731.401, *et seq*., Dkt. 1 at 8; (3) depriving him of his property interest in his employment, as secured by his contract, without providing due process, *id.* at 9; and (4) improperly debarring him from eligibility to work for the agency without providing due process, *id.* at 10.

Defendants' motion to dismiss takes a circuitous approach to Plaintiff's due process claims.  The motion spends several pages explaining why the first four counts do not state claims under the Fourteenth Amendment, the equal protection clause of the Fifth Amendment, or the Federal Tort Claims Act, as well as why the Court lacks jurisdiction over any *Bivens* claims that

might be hiding in those counts.  Dkt. 21 at 6–11.  Of course, *pro se* complaints are construed broadly, so the Court does not fault Defendants for covering their bases.  But although some of those sundry legal theories might be implicit in the pleading, Plaintiff explicitly and repeatedly states that he brings the first four counts under the due process clause of the Fifth Amendment. Dkt. 1 at 7–11.  The motion to dismiss, however, devotes only three sentences to due process. Dkt. 21 at 7.  Defendants argue only that Plaintiff's due process claims must be dismissed because he did not have a property interest in his security clearance and because the MCC and Blades did not stigmatize Plaintiff's reputation in a way that prevented him from obtaining future employment.  *Id*.

In opposition, Plaintiff advances two legal theories to support his procedural due process claims.  First, he asserts a property interest not in the security clearance, but in his job itself. Dkt. 23 at 5–8.  He argues that both his "personal services contract" and the regulations governing "suitability determinations" gave him a property interest in continued employment and that Defendants deprived him of that interest without either notice or an opportunity to challenge the results of the background investigation, specifically the "false, inaccurate[,] or misleading statements contained within the MCC Adjudication Worksheet."  *Id*. at 6–7.  Second, Plaintiff asserts a reputation-based, "stigma-plus" due process claim, alleging that Defendants infringed a protected liberty interest by terminating and debarring him, which prevented him from obtaining future employment in his chosen field.  *Id*. at 8–9.  The Court will consider Plaintiff's due process theories in turn.

1.    *Property Interest in Continued Employment*

Federal employees who may be fired only for cause have a property interest in their employment.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985).  "To

determine whether [a federal employee] had a property interest in continued employment, [courts] ask if he had a legitimate expectation, based on rules (statutes or regulations) or understandings (contracts, expressed or implied), that he would continue in his job." *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988).  Cases involving government employees typically "fall into one of two categories: terminable at will or terminable only for cause," with only those in the latter category holding a property interest in their employment.  *Id.*

The record before the Court is not especially illuminating as to the nature of Plaintiff's two-month employment relationship with the MCC.  It is unclear whether Plaintiff was terminable at will or only for-cause, and the parties devote no attention to the distinction between government employees and government contractors.  And, perhaps even more significant for present purposes, it is unclear whether the position required only a routine background check, like the ones that many private employers conduct, or instead required a formal security clearance, which provides access to classified or other sensitive government information.  The complaint states that Lamb worked "as a contractor for the MCC in a position that required a favorable background check."  Dkt. 1 at 3 (Compl. ¶ 7).  The complaint also refers to this as a "background investigation," *id.* (Compl. ¶ 8); a "security check," *id.* (Compl. ¶ 9); and a "suitability determination," Dkt. 1 at 6 (Compl. ¶ 23).  Defendants' motion to dismiss argues only that "[n]o one may hold a property interest in a security clearance," without addressing the nature or status of Plaintiff's employment or whether Plaintiff's job even required a security clearance.  Dkt. 21 at 7.  In opposing the motion to dismiss, Plaintiff argues that his contract with Sawdey "promised continued employment unless he failed the security clearance."  Dkt. 23 at 6.  Plaintiff also asserts, in apparent conflict with that previous statement, that according to a Sawdey official, "this contract did not even require a security clearance," and "even if it did[,]

Plaintiff's ROI was completed under favorable conditions." *Id*. at 7.  In reply, Defendants argue that Plaintiff was "a conditional new hire and probationary employee."  Dkt. 25 at 2.  The parties thus do not make clear where Plaintiff fell in the at-will or for-cause dichotomy.

Construing the complaint liberally, taking all of its factual allegations as true, and drawing all reasonable inferences in Plaintiff's favor, one could read the complaint as alleging that Plaintiff had a property interest in continued employment because his contract with Sawdey rendered him removable only for cause and that the MCC's unfavorable adjudication of his background investigation was the direct cause of his termination.  Putting aside the distinction between government employees and contractors, which the parties do not address and which the Court will not take up in the first instance, this case presents a question similar to the one the Court recently considered in *Dodson v. U.S. Capitol Police*, Civil Action No. 18-2680 (RDM), 2019 WL 4860720, at *5 (D.D.C. Sept. 30, 2019).  In that case, the plaintiff alleged that his firing from the Capitol Police, based on a series of disciplinary issues, violated his due process rights.  *Id*. at *2.  The plaintiff had signed a "Last Chance Agreement" providing that any further disciplinary issues would "result in the termination of your employment, and you are not entitled to an appeal, grievance[,] or any other challenge of the recommended termination."  *Id*.  At the motion to dismiss stage, the Court concluded that the plaintiff's contract did not render him an at-will employee because the agreement permitted his "termination only after a predicate finding of a disciplinary violation—in other words, only for cause."  *Id*. at *5.  Here, Plaintiff's complaint can be read as asserting a similar claim: because Plaintiff's contract provided for

termination only after a predicate finding of a failed background investigation, he was removable only for cause and had a property interest in his position.[1]

This argument cannot reasonably apply, however, to jobs requiring a security clearance because it would swallow the rule that an employee cannot hold a property interest in a security clearance. *See Doe v. Cheney*, 885 F.2d 898, 909 (D.C. Cir. 1989). In *Doe v. Cheney*, the National Security Agency ("NSA") revoked an employee's security clearance and then terminated him because, without the clearance, he failed "to meet the statutory standards for employment in a critical and sensitive position that require[s] access to highly classified information." *Id.* at 902. The D.C. Circuit held that, because no one has a right to a security clearance, "Doe had no entitlement to access" classified information and "cannot argue that NSA has deprived him of a property interest." *Id.* at 909. The Court's analysis made no distinction between his loss of the clearance and his loss of employment because, for jobs that require a clearance, they form one indivisible whole.

Applying that rule in this case is complicated by the lack of clarify surrounding Plaintiff's termination. Plaintiff started work under the (apparently false) impression that he had already

---

[1] In their reply brief, Defendants argue for the first time that Plaintiff lacked a property interest in continued employment because he was "a conditional new hire and probationary employee." Dkt. 25 at 2. As an initial matter, the Court need not consider this argument because it was raised for the first time in the reply brief. *See United States v. Apodaca*, 251 F. Supp. 3d 1, 5 (D.D.C. 2017). But even if the Court were to consider this argument, the line of cases holding that probationary employees do not possess property interests in continued employment simply illustrates the at-will versus for-cause distinction. Those cases stand for the unremarkable proposition that probationary employees typically are terminable at will and therefore do not have a protected property interest in continued employment. *See, e.g.*, *Williams v. Seniff*, 342 F.3d 774, 787 (7th Cir. 2003); *Finley v. Giacobbe*, 79 F.3d 1285, 1297 (2d Cir. 1996). That does not address whether a contract guaranteeing employment unless certain conditions are met is properly classified as at-will or for-cause. Defendants may well be correct that Plaintiff cannot claim a property interest in his employment because it was contingent on passing a background check, but they must do more to develop that argument, in a timelier manner, to prevail.

completed the required background investigation for his new job.  Dkt. 1 at 3 (Compl. ¶ 7).  Two

weeks after starting, however, Plaintiff learned from an MCC security officer that the State

Department would be conducting his background investigation, which had not yet been

completed.  *Id*. (Compl. ¶ 8).  Several weeks after that, the MCC abruptly terminated Plaintiff

without explanation.  *Id*. (Compl. ¶ 9).  Plaintiff later learned from Sawdey, his direct employer,

that the reason for his termination was that his "security check" was unfavorable.  *Id*.  Plaintiff

alleges that the documents related to his background investigation show that the State

Department initially gave a favorable determination, but the MCC then deemed his results

unfavorable.  *Id*.  Based on the complaint, it is unclear whether the terms "background

investigation" and "security check" are synonymous and, more importantly, whether Plaintiff's

background was investigated merely for suitability or, in addition, for access to classified

information.  In their briefs, as noted above, the parties use the terms "background investigation"

and "security clearance" interchangeably, but they never address whether Plaintiff's job required

that he be qualified to receive access to classified information.

Given this ambiguity, the Court cannot conclude on the current record that *Doe v. Cheney*

controls this case.  To be sure, "the protection of classified information must be committed to the

broad discretion of the agency responsible, and this must include broad discretion to determine

who may have access to it."  *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988).  Therefore, "[i]t

should be obvious that no one has a 'right' to a security clearance."  *Id*. at 528.  But the national

security concerns animating that rule would apply with less force to a routine background check

for a job that does not require or anticipate access to classified information.  And, here, the Court

cannot discern from the existing record whether the background investigation at issue was for

purposes of authorizing Plaintiff's access, if necessary, to classified information or whether it

was more akin to the type of background check that a private employer might undertake. Defendants' one-sentence argument that Plaintiff lacks a property interest in a security clearance would support dismissal under the former circumstance.  But they have not shown—or even argued—that it would support dismissal under the latter.  The Court takes no position on that question, other than to note that it remains unanswered.  Likewise, although Plaintiff might have lacked a property interest in his employment for some other reason, Defendants have made no effort to support any such alternative argument.  Accordingly, the Court must deny Defendants' motion to dismiss as to Plaintiff's property-interest-based due process claim.

Before moving on, the Court will briefly address, for the sake of clarifying the issues in future stages of this litigation, Plaintiff's additional argument that regulations governing "suitability determinations," 5 C.F.R. § 731.101 *et seq*., confer on him a property interest in continued employment.  This argument is mistaken for two reasons.  First, those regulations do not apply to Plaintiff as an employee of an MCC contractor.  *See id.* § 731.101 (defining "covered position" as "a position in the competitive service, a position in the excepted service where the incumbent can be noncompetitively converted to the competitive service, and a career appointment to a position in the Senior Executive Service"); *compare* 22 U.S.C. § 7713(a)(8) (providing that the MCC's personal service contractors "shall not be considered [f]ederal employees for any provision of law administered by the Office of Personnel Management") *with* 5 C.F.R. § 731.104 (explaining that OPM is responsible for administering suitability determinations).  Second, even if those provisions did apply to Plaintiff, they would be relevant only to what procedures were due once a property interest was established, not to establishing the property interest in the first place.  *See Loudermill*, 470 U.S. at 541 ("'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty.").

2.      *Stigma-Plus*

Plaintiff also alleges that his termination based on the failed security check and

subsequent debarment has deprived him of a protected liberty interest by preventing him from

finding work in his chosen profession.  Dkt. 23 at 8–9.  Defendants' motion to dismiss addresses

this claim in two sentences, arguing that Plaintiff "has not made allegations sufficient to show

that the agency or Blades stigmatized his reputation and that the stigma has hampered future

employment prospects."  Dkt. 21 at 7.

A line of decisions from the D.C. Circuit has delineated two situations in which an

adverse government employment decision might infringe a protected liberty interest.  *See*

*O'Donnell v. Barry*, 148 F.3d 1126, 1139–42 (D.C. Cir. 1998); *Doe v. DOJ*, 753 F.2d 1092,

1104–12 (D.C. Cir. 1985); *see also Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016)

(explaining that a government-employee plaintiff "may avail himself of two different legal

theories to establish a reputation-based due-process violation").  The first theory, known as a

"reputation-plus" claim, requires showing "the conjunction of official defamation and adverse

employment action."  *O'Donnell*, 148 F.3d at 1140.  Although government defamation alone is

not actionable, defamation in the course of termination is.  *Id*. (citing *Paul v. Davis*, 424 U.S.

693, 710 (1976)).  The second theory, known as a "stigma-plus" claim, requires "the

combination of an adverse employment action and 'a stigma or other disability that foreclosed

[the plaintiff's] freedom to take advantage of other employment opportunities.'" *Id*. (quoting

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)).  A stigma-plus claim differs

from a reputation-plus claim in that "it does not depend on official *speech*, but on a continuing

stigma or disability arising from official *action*."  *Id*. (emphasis added).  Although Plaintiff in his

opposition to the motion to dismiss at times conflates the two standards, he labels his claim

"stigma-plus," and that theory is the best fit for the facts of the case, so the Court will consider

his claim under the test for establishing a stigma-plus due process violation.

Although cited by neither party, the D.C. Circuit's decision in *Kartseva v. Department of State*, 37 F.3d 1524 (D.C. Cir. 1994), is on point.  There, as here, the plaintiff was fired from her

job with a government contractor, in that case as a Russian translator at a company that did work

for the Department of State.  *Id*. at 1525–26.  There, as here, the plaintiff lost her job because the

agency "declared her ineligible to work on the [government] contract" on the basis of an

unfavorable "background check" related to security concerns.  *Id*.  There, as here, the agency

declined to provide any explanation of its reasoning or opportunity to challenge the decision.  *Id*.

There, the district court held that the plaintiff had neither been denied a formal security clearance

nor officially debarred from working on agency projects, *id*. at 1528, whereas here, Plaintiff

alleges that he was debarred from working on contracts with the MCC for 36 months, Dkt. 1 at 3

(Compl ¶ 9).  There, as here, the plaintiff was unable to find any further government work after

her termination.  *Kartseva*, 37 F.3d at 1526.

The court of appeals in *Kartseva* held that this set of facts was sufficient to make out a

stigma-plus claim at the motion-to-dismiss stage.  *Id*. at 1527.  The court held that, although

additional fact-finding was needed on remand, Kartseva could prevail on her stigma-plus claim

by making either of two showings.  *Id*. at 1527–28.  First, she could demonstrate that the

agency's "action formally or automatically excluded Kartseva from work on some category of

future [State Department] contracts or from other government employment opportunities."

*Id*. at 1528.  This might be because she was excluded from working with the State Department

again or because her unfavorable security check "is available to future potential government

employers" and "would automatically preclude Kartseva from meeting eligibility criteria for

other jobs." *Id*.  Second, she could show that even if the agency's "action does not have this

*binding* effect," the adverse employment decision "nevertheless ha[d] the *broad* effect of largely

precluding Kartseva from pursuing her chosen career." *Id*. (emphasis in original).  If "the

disqualification encompasse[d] all [State Department] contracts," for instance, "that would

suggest that [the failed security check] might be sufficiently stigmatic to work a similar

disqualification through much of Kartseva's field." *Id*. at 1530.

Here, the Court concludes that Plaintiff has plausibly alleged a stigma-plus due process

violation based on the combination of "an adverse employment action" and an attendant stigma

affecting his "freedom to take advantage of other employment opportunities." *O'Donnell*, 148

F.3d at 1140.  No one disputes that Plaintiff's unfavorable background investigation led to his

termination, and an agency's decision to fire an employee "is an example of a paradigmatic

status change." *Doe v. Cheney*, 885 F.2d at 910.  Plaintiff has also sufficiently pled that his

unfavorable security check stigmatized him in his efforts to obtain other jobs in his field.  He

alleges that his termination led to a 36-month debarment that prevented him from working on

other contracts for the MCC and that Sawdey declined to hire him in any capacity for any other

government contract.  Dkt 1 at 3–4 (Compl. ¶ 9).  Plaintiff further alleges that the results of his

security check, including the Adjudication Worksheet, were available to other agencies who

might consider hiring Plaintiff, which has prevented him from finding any work in his chosen

field.  *Id*.; *see also* Dkt. 23 at 9 ("[F]or someone such as Plaintiff whose whole professional life

has been in the federal government or working for federal contractors, these allegations have

proven fatal to Plaintiff's efforts to find employment in this sector.").  Plaintiff has thus pled

facts sufficient to show both that he was "formally or automatically" excluded from future work

with Sawdey and the MCC and that the adverse security check has the "broad effect of largely

precluding" Plaintiff from working in his chosen profession as a government contractor. *See Kartseva*, 37 F.3d at 1528.

In their reply brief, Defendants argue that Plaintiff was not actually debarred and that the Adjudication Worksheet "shows only that a 36 month debarment was proposed" but apparently "never became effective." Dkt. 25 at 3. This argument is unpersuasive. At the motion to dismiss stage, the Court must accept all factual allegations in the complaint as true, and the complaint alleges that Plaintiff was debarred for 36 months. The Adjudication Worksheet recommends a 36-month debarment and is, at best, ambiguous as to whether that debarment went into effect. *See* Dkt. 23-5 at 1. It may be that additional fact-finding will reveal that Plaintiff was never subject to a formal debarment decision, but that is a question for discovery. And in any event, formal debarment is not required to make out a stigma-plus claim. The court of appeals in *Kartseva* held that the plaintiff's claim was viable even though she was not subject to an official debarment action. *Kartseva*, 37 F.3d at 1528. Here, in addition to alleging that he was disbarred, Plaintiff also alleges that "[d]espite [his] best efforts at seeking alternative employment, the contractor with whom [he] had been employed refused to hire him in any other capacity for any other government contract . . . for which he was qualified;" that the MCC has also refused to hire him; and that "[t]o date[,] [he] is still seeking employment." Dkt. 1 at 3–4 (Compl. ¶ 9). His claim thus does not turn on debarment alone.

Finally, Defendants argue in their reply that Plaintiff's stigma-plus claim should be dismissed because there "are no allegations in the Complaint that anyone at MCC actually said or did anything to stigmatize Plaintiff's reputation beyond notifying his contractor employer at the time that the background adjudication was unfavorable." Dkt. 25 at 3. Defendants argue that Plaintiff's allegations are therefore insufficient to make out a stigma-plus claim under *Doe v.*

17

*DOJ*, 753 F.2d at 1104–12.  In that case, the D.C. Circuit held that the plaintiff, an attorney who

was fired from the Department of Justice amid allegations of dishonesty, had stated a claim

under either a reputation-plus or stigma-plus theory.  *Id*. at 1110–12.  Defendants' argument

seems to conflate the separate reputation-plus and stigma-plus analyses.  Although a reputation-

plus claim requires showing that the government made defamatory statements concerning the

plaintiff, no such defamation is required for a stigma-plus claim.  Rather, Plaintiff need show

only the combination of an adverse employment action and a resulting stigma that prevents him

from working in his chosen field.  *O'Donnell*, 148 F.3d at 1140.

Plaintiff has alleged facts sufficient to support each element of the stigma-plus test.  The

Court will, accordingly, deny Defendants' motion to dismiss with respect to Plaintiff's liberty-

interest-based due process claim.

## B.   Privacy Act Section 552a(e)(5) (Counts V–VI)

Although Plaintiff either raised, or attempted to amend his complaint to raise, a variety of

Privacy Act claims in his prior lawsuit, the Court observed in *Lamb I* that it did not understand

Plaintiff to allege a violation of 5 U.S.C. § 552a(e)(5).  *Lamb I*, 228 F. Supp. 3d at 40 n.1.

Counts V and VI of Plaintiff's complaint now assert claims against the MCC[2] under Section

552(e)(5) as to two documents, the Adjudication Worksheet and a letter dated April 15, 2016.

Dkt. 1 at 11–14.  In relevant part, the Privacy Act mandates that "[e]ach agency that maintains a

system of records . . . maintain all records which are used by the agency in making any

---

[2]  Plaintiff mentions only the MCC, and not Blades, in pleading his Privacy Act claims in Counts
V and VI.  *See* Dkt. 1 at 11–14.  Nor could he bring those claims against Blades, because it "is
well-settled that no cause of action exists that would entitle a plaintiff to obtain relief from an
individual under the Privacy Act or FOIA."  *Lamb I*, 228 F. Supp. 3d at 35 (internal quotation
marks and citation omitted).  The Court therefore reads the complaint as alleging Counts V and
VI against the MCC alone and not Blades.

determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5). If an agency fails to do so, and "consequently a determination is made which is adverse to the individual," the individual may sue the agency in federal district court. *Id*. § 552a(g)(1)(C). A plaintiff may recover damages if he establishes that the agency "acted in a manner which was intentional or willful." *Id*. § 552a(g)(4).

To state a claim for damages under Section 552a(g)(1)(C), Plaintiff must allege that (1) he "has been aggrieved by an adverse determination;" (2) the MCC "failed to maintain his records with the degree of accuracy necessary to assure fairness in the determination;" (3) the MCC's "reliance on the inaccurate records was the proximate cause of the adverse determination;" and (4) the MCC "acted intentionally or willfully in failing to maintain accurate records." *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996).

Plaintiff alleges that the MCC terminated him based on the inaccurate and incomplete Adjudication Worksheet, in which the agency "intentionally and willfully misrepresented the record." Dkt. 1 at 12. He alleges the Adjudication Worksheet inaccurately states that he was removed from a previous job for being absent without leave and that he has a delinquent financial account. *Id*. He further alleges that the Adjudication Worksheet provides "unnecessary and incomplete" information about his mental health treatment. *Id*. Finally, he alleges that the Adjudication Worksheet includes a "patently false statement" that the ROI did not include additional information on the issues raised. *Id*. As for the letter, Plaintiff alleges that it was incomplete because of the "intentional omission of an enclosure describing the specific charge(s) as well as a summary of the investigative information which served as the basis" for MCC

finding Plaintiff unfit for employment. *Id*. at 13.  Overall, Plaintiff alleges that these inaccuracies and omissions led to his termination. *Id*. at 11–12.

Although the complaint identifies Sections 552a(e)(5) and 552a(g)(4)—and, by extension, Section 552a(g)(1)(C)—as the statutory basis for Plaintiff's Privacy Act claims, Defendants misconstrue Counts V and VI as seeking to correct personnel records under Sections 552a(d) and 552a(g)(1)(A). Dkt. 21 at 11–12.  Based on this reading of the complaint, Defendants argue that Plaintiff's Privacy Act claims must be dismissed for failing to exhaust administrative remedies. *Id*.  But, although Section 552a(g)(1)(A) requires exhaustion of administrative procedures, Section 552a(g)(1)(C)—the provision on which Plaintiff premises his claims—does not.  Defendants' exhaustion argument is therefore unavailing.

In their reply brief, Defendants argue that Plaintiff's claims under Section 552a(g)(1)(C) must be dismissed for the additional reason that the "complaint fails to allege facts to establish any causal connection between the adjudication worksheet (Count Five) or the partial letter addressed to Lamb (Count Six) and any adverse determinations." Dkt. 25 at 5.  Because this argument was raised for the first time in the reply brief, the Court need not consider it. *Apodaca*, 251 F. Supp. 3d at 5 (D.D.C. 2017).  But, in any event, at least with respect to the Adjudication Worksheet, the Court concludes that Plaintiff has made the requisite allegation of causation.  "At this stage of the proceeding, Plaintiff must simply plead a causal connection between the agency violation and the adverse effect." *Fleck v. Dep't of Veterans Affairs*, No. 18-1452 (RDM), 2020 WL 42842, at *8 (D.D.C. Jan. 3, 2020) (internal quotation marks and citations omitted); *see also Deters*, 85 F.3d at 657 (requiring that "reliance on the inaccurate records [be] the proximate cause of the adverse determination").  Plaintiff plausibly alleges that he lost his job because of the (allegedly inaccurate) Adjudication Worksheet. Dkt. 1 at 5 (Compl. ¶¶ 17–20).  The

document itself, as incorporated by reference in the complaint, lists "unfavorable determination" as its final action and suggests 36 months as the "length of proposed debarment."  Dkt. 23-5 at 1. Drawing all inferences in Plaintiff's favor, the Court concludes that Plaintiff has sufficiently alleged that the Adjudication Worksheet caused his termination.

Matters are less clear with respect to the letter.  Based on the complaint, the Court is uncertain whether Plaintiff is alleging that omissions from the letter led to his termination or that the MCC omitted the material in question when responding to Plaintiff's later requests for information under FOIA and the Privacy Act, as litigated in the prior case.  Only the former theory is a proper basis for a claim under Section 552a(g)(1)(C).  Although far from clear, the complaint seems to allege that the omission occurred when the MCC provided Plaintiff with an incomplete copy of the letter on October 11, 2018, over a year after Plaintiff's termination. Dkt. 1 at 13.  If so, the omission could not possibly have caused Plaintiff to lose his job.  Even construing the *pro se* complaint generously, the Court can conceive of no set of facts on which the Plaintiff could make the requisite causation showing for the incomplete letter.

Accordingly, the Court will deny the MCC's motion to dismiss with respect to Count V and grant it with respect to Count VI.  Given the ambiguity in Plaintiff's complaint and Defendants' delay in raising this argument, however, the Court will grant Plaintiff leave to file an amended complaint clarifying this claim, if appropriate, on or before December 1, 2020.

## C.    Other Claims

The Court does not read Plaintiff's complaint as raising any other claims.  In their motion to dismiss, however, Defendants read a variety of other claims into the complaint and argue why each of them should be dismissed under either Rule 12(b)(6) or 12(b)(1).  *See generally* Dkt. 21. In his opposition brief, Plaintiff picks up on one of these theories and argues that his complaint

states a claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, or, in the alternative, that he should be granted leave to amend his complaint to name the United States as a defendant in support of his FTCA claim.  Dkt. 23 at 10–11.  In *Lamb I*, the Court addressed many of these other issues raised in the motion to dismiss, in the context of deciding Plaintiff's motion to amend his complaint to add various claims.  *See Lamb I*, 228 F. Supp. 3d at 39–47.  For many of the same reasons articulated in that opinion, the Court will dismiss Lamb's complaint insofar as it raises any claims not already discussed above.  The Court leaves open the possibility, however, that Plaintiff could file a motion to amend or to supplement his complaint to assert FTCA claims once he has received a final denial of his administrative complaint.

    1.    *14th Amendment*

Plaintiff pleads his due process claims under both the Fifth and Fourteenth Amendments. *See* Dkt. 1 at 7.  Defendants move to dismiss Plaintiff's Fourteenth Amendment claims on the ground that the Fourteenth Amendment does not apply to the federal government.  Dkt. 21 at 6; s*ee Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  As explained above, Plaintiff's due process claims may proceed under the Fifth Amendment, but any claims under the Fourteenth Amendment must be dismissed for the reason Defendants give.

    2.    *Equal Protection*

Defendants move to dismiss Plaintiff's complaint "[t]o the extent his claims can be construed as equal protection claims."  Dkt. 21 at 6.  In *Lamb I*, the Court denied Plaintiff's motion to amend his complaint to add an equal protection claim because the proposed amendment would have been futile.  *Lamb I*, 228 F. Supp. 3d at 46–47.  The Court concluded that such a claim would be futile because "Title VII and the Rehabilitation Act provide the exclusive remedy for claims of employment discrimination based on race, religion, sex, national

origin, and disability." *Id*. at 46.  And "to the extent that Lamb was not a federal employee, but rather a private contractor, he would have no basis to sue the federal government for employment discrimination." *Id*. at 47.  Here, Plaintiff's complaint suffers from the same defects and, unlike in the proposed amended complaint at issue in *Lamb I*, Plaintiff does not even allege in his current complaint that the MCC treated him differently than any other employee.  The most likely explanation for this omission is that Plaintiff is not trying to bring an equal protection claim in this case.  But insofar as his complaint can be read to raise an equal protection claim, that claim must be dismissed under Rule 12(b)(6).

3.    *FTCA*

Defendants also move to dismiss Plaintiff's complaint insofar as it alleges "a tort claim [under the FTCA] in connection with the non-suitability determination, termination, or debarment."  Dkt. 21 at 7.  Defendants argue that the Court has no jurisdiction over any FTCA claim against Blades or the MCC because Plaintiff did not first exhaust administrative remedies. *Id*. at 8.  As the Court explained in *Lamb I*, under the FTCA, "[a]n action shall not be instituted upon a claim against the United States for money damages . . . , unless the claimant [has] first presented the claim to the appropriate Federal agency and his claim [has] been finally denied by the agency in writing."  28 U.S.C. § 2675(a).  The failure to exhaust administrative remedies, moreover, poses a jurisdictional bar to suit.  *Lamb I*, 228 F. Supp. 3d at 46.

In his opposition to the motion to dismiss, Plaintiff explains that he filed an administrative complaint with the MCC on July 22, 2019, several months after filing this lawsuit. Dkt. 23 at 10.  Plaintiff argues that this is sufficient to meet the exhaustion requirement and that, under the doctrine of equitable tolling, Defendants' refusal to reveal the basis for his termination prevented him from filing the administrative action until after he received the underlying

documents in the prior suit.  *Id*. at 10–11.  In reply, Defendants argue that the only relevant question is whether "the plaintiff had exhausted his administrative remedies at the time he filed his complaint."  Dkt. 25 at 4.

Defendants have the better of the argument.  Unlike a statute of limitations, which may be tolled in certain cases, the FTCA's exhaustion requirement is jurisdictional.  Because Plaintiff did not exhaust administrative remedies *before* filing suit, it is irrelevant that he later filed an administrative action.  *See McNeil v. United States*, 508 U.S. 106, 111–13 (1993).  Because Plaintiff did not exhaust his administrative remedies, the Court must dismiss his FTCA claims, insofar as his complaint can be read to present any, for lack of subject matter jurisdiction.

Whether Plaintiff can amend his complaint to cure this defect presents a more difficult question.  As noted above, the FTCA provides that a federal lawsuit "shall not be instituted" until after the plaintiff has "first presented the claim to the appropriate [f]ederal agency" and that claim has "been finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a).  The Supreme Court has interpreted the word "instituted" in the FTCA as meaning to "begin" or "commence," such that exhaustion is required "before invocation of the judicial process."  *McNeil*, 508 U.S. at 112.  Although "a plaintiff can often cure a pleading defect by amending the complaint," an amended or supplemental complaint cannot change when a plaintiff brought his action.  *See U.S. ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 929 (D.C. Cir. 2017) (reaching a similar conclusion in the context of the False Claims Act based on the "distinction between the complaint and the underlying action").

In a more recent decision, however, the D.C. Circuit took a more practical approach to whether a plaintiff could cure a defect in Article III standing through an amended or supplemental complaint.  *Scahill v. D.C.*, 909 F.3d 1177, 1182–84 (D.C. Cir. 2018).  Although

jurisdiction is generally determined at the time a plaintiff brings suit, the court of appeals concluded that permitting plaintiffs to cure such jurisdictional defects through amended pleadings avoids "the unnecessary hassle and expense of filing a new lawsuit when events subsequent to filing the original complaint have fixed the jurisdictional problem." *Id.* at 1184. The court of appeals based its decision on Supreme Court cases that assessed jurisdiction based on supplemental pleadings filed subsequent to the initial complaint, *see Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007); *Mathews v. Diaz*, 426 U.S. 67, 75 (1976), and on the supplemental pleading provision of Federal Rule of Civil Procedure 15(d), which provides that such pleading may "set[ ] out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented," Fed. R. Civ. P. 15(d).  *See Scahill*, 909 F.3d at 1182–84.  The *Mathews* case from the Supreme Court is particularly relevant because it also dealt with an administrative exhaustion requirement.  426 U.S. at 75.  Although exhaustion was a "nonwaivable condition of jurisdiction," the Supreme Court had "little difficulty" asserting jurisdiction because the plaintiff "satisfied this condition while the case was pending in the District Court" and "[a] supplemental complaint in the District Court would have eliminated this jurisdictional issue." *Id.*

For present purposes, the Court need not resolve any potential tension between the Supreme Court's decision in *McNeil* and the D.C. Circuit's holding in *Scahill*.  The record before the Court indicates that Plaintiff filed an administrative complaint with the MCC more than a year ago, Dkt. 23 at 10, but it remains unclear whether the MCC has issued a final denial of that complaint in writing.  It is thus premature for the Court to consider whether an amendment to Plaintiff's complaint or a supplemental complaint might remedy his failure to exhaust.  For now,

25

the Court will leave open to the possibility that Plaintiff may file a motion to amend his complaint to assert claims under the FTCA once he has exhausted the administrative process.

    4.    *Bivens*

Defendants next move to dismiss the complaint to the extent that Plaintiff asserts claims for damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against Blades in his individual capacity.  Insofar as Plaintiff seeks to recover under *Bivens* for Defendants' withholding of information in the prior lawsuit, the D.C. Circuit has held that both the Privacy Act and FOIA constitute the type of comprehensive remedial scheme that precludes the creation of a *Bivens* remedy.  *See Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008) (Privacy Act); *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 777 (D.C. Cir. 2002) (FOIA).  If Plaintiff instead seeks to file a *Bivens* action against Blades based on alleged due process violations, courts have rejected the creation of a *Bivens* action in the context of due process claims brought by government contractors challenging their terminations.  *See, e.g.*, *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 403–06 (2d Cir. 2015); *see also Liff v. Office of Inspector Gen., U.S. Dep't of Labor*, 881 F.3d 912, 919–24 (D.C. Cir. 2018).  Because the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants," *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001), the Court is unprepared to do so here, especially given that it is unclear whether Plaintiff intended to bring a *Bivens* action in the first place.

In any event, the Court agrees with the Second Circuit's conclusion that it would be inappropriate to create a cause of action under *Bivens* for the due process claims brought by the employees of government contractors.  *Atterbury*, 805 F.3d at 405–06.  In deciding whether to extend *Bivens* to a new context, courts must engage in a two-step analysis.  *Wilkie v. Robbins*,

551 U.S. 537, 550 (2007).  First, the Court must consider "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."  *Id.* (internal citation omitted).  Second, "even in the absence of an alternative," the Court "must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Id.* (internal quotation marks and citation omitted).  Neither the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 7101 *et seq.*, nor the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95–454, 92 Stat. 1111 *et seq.* (codified, as amended, in various sections of Title 5 of the United States Code), permit civil actions by the employees of government contractors against the government.  There is thus no existing process for protecting Plaintiff's interests, aside from perhaps a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.  But as the Second Circuit observed in *Atterbury*, the CDA's and CSRA's comprehensive remedial schemes represent a "special factor counseling hesitation at the second step" of the analysis.  *Atterbury*, 805 F.3d at 404.  Courts generally "assume that the omission of particular relief from a comprehensive congressional scheme 'has not been inadvertent,'" *id.* at 404–05 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)), and it would be paradoxical to put government contractors' employees, through extension of *Bivens*, in a better position than either government contractors themselves under the CDA or the government's own employees under the CSRA.

Plaintiff's *Bivens* claims, to the extent the complaint can be read to raise any, must therefore be dismissed.

## CONCLUSION

For these reasons, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion to dismiss, Dkt. 21.  The motion is **DENIED** with respect to Plaintiff's due process claims in Counts I through IV and with respect to Plaintiff's Privacy Act claim in Count V.  The motion is **GRANTED** with respect to Plaintiff's Privacy Act claim in Count VI, which is dismissed without prejudice.  As noted above, the Court grants Plaintiff leave to file an amended complaint clarifying his claim in Count VI, if appropriate, on or before December 1, 2020. The motion is also **GRANTED** with respect to any other claims that might be presented in the complaint.  But because the Court is unsure whether Plaintiff intended to raise any other claims—and because some of those claims could be asserted through an amended complaint or refiled after exhaustion of administrative remedies—those additional claims are dismissed without prejudice as well.  Finally, Plaintiff's motion to correct his response to the motion to dismiss, Dkt. 26, is **GRANTED**.

   **SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  November 3, 2020

28