## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JERRY GORALSKI LAMB,

         *Plaintiff*,

    v.

MILLENNIUM CHALLENGE
CORPORATION, *et al.*,

        *Defendants*.

Civil Action No. 19-589 (RDM)

## <u>MEMORANDUM OPINION</u>

Plaintiff Jerry Goralski Lamb worked for about two months in 2016 as a "personal services contractor" with the Millennium Challenge Corporation ("MCC"), a government corporation that provides grants and other economic development assistance to eligible countries. He was employed at will by Sawdey Solution Services, Inc., and his position was contingent on completing a successful background check. Lamb's background check, however, turned up some employment history that MCC staff found concerning, and the staff began preparations to issue a determination that Lamb was unsuitable for the position. Before that process was completed, however, an MCC official, James Blades, decided to revoke Lamb's access to the MCC building where he worked. He was fired by Sawdey later that day.

Lamb claims that Blades and the MCC (collectively, "Defendants") violated his Fifth Amendment right to due process and the Privacy Act, 5 U.S.C. § 552a. Now that discovery has closed, Defendants move for summary judgment on both counts. The Court agrees with Defendants that the record reveals no triable issue of fact and that they are entitled to summary judgment. First, the uncontroverted evidence establishes that nothing Defendants have done has

deprived Lamb of a constitutionally protected interest.  Because he was employed at will, he had

no protected property interest in his job at Sawdey or in his assignment to the MCC.  Nor does

the record contain evidence that would permit a reasonable jury to find that Defendants deprived

Lamb of a cognizable liberty interest by either disqualifying him from future employment with

the MCC or other government agencies or by preventing him from otherwise finding work in his

field.  Second, Lamb's Privacy Act claims are barred by the statute of limitations.

The Court will, accordingly, **GRANT** Defendants' motion for summary judgment, Dkt.

77.

## I. BACKGROUND

Much of the background of this case is described in the Court's trilogy of opinions in

Lamb's prior lawsuit seeking records related to his termination, *see Lamb v. Millennium*

*Challenge Corp.*, 228 F. Supp. 3d 28, 33–35 (D.D.C. 2017) ("*Lamb I*"); *Lamb v. Millennium*

*Challenge Corp.*, 334 F. Supp. 3d 204, 209–10 (D.D.C. 2018) ("*Lamb II*"); *Lamb v. Millennium*

*Challenge Corp.*, Civil Action No. 16-765 (RDM), 2019 WL 4141868, at *1–2 (D.D.C. Aug. 30,

2019) ("*Lamb III*"), and in the Court's two prior opinions in this case, *see Lamb v. Millennium*

*Challenge Corp.*, 498 F. Supp. 3d 104 (D.D.C. 2020) ("*Lamb IV*"); *Lamb v. Millennium*

*Challenge Corp.*, 573 F. Supp. 3d 346 (D.D.C. 2021) ("*Lamb V*").  The Court repeats only those

allegations that are relevant to Lamb's remaining claims.  Because the case is now at the

summary judgment stage, the Court relies on those facts that are supported by "particular parts of

materials in the record" that are uncontroverted by any conflicting materials.  Fed. R. Civ. P.

56(c).

In November 2015, Lamb applied and was later hired for a position at Sawdey Solutions

Services, Inc., which served as a contractor for the MCC.  *Lamb I*, 228 F. Supp. 3d at 33.  The

job required that Lamb "augment" MCC employees as a "personal services contractor." *Id*. at

34.  The MCC is a corporation established in the executive branch of the federal government.

*See* 22 U.S.C. § 7703(a).  It is authorized to provide foreign assistance to countries that enter a

compact with the United States setting forth a plan for "achieving shared development

objectives." *Id.* § 7708(a).  The MCC "may contract with individuals for personal services, who

shall not be considered [f]ederal employees for any provision of law administered by the Office

of Personnel Management." *Id*. § 7713(a)(8).

Lamb's work at the MCC required a favorable "public trust" background check.  Dkt. 79-

1 at 3 (Defs.' SUMF ¶ 6).  That process required him to fill out an investigative form, after which

the State Department Bureau of Diplomatic Security would conduct an investigation, and MCC

would "adjudicat[e] fitness for employment based on the information developed in the

investigation." *Id.* at 3–4 (Defs.' SUMF ¶ 7).  Lamb filled out the requisite forms and started

work on February 22, 2016, believing that he had already received the necessary approval.  Dkt.

79-2 at 2 (Lamb Decl. ¶¶ 3–4).  But a few weeks later, sometime in March, he was informed that

a Department of State investigator needed to interview him in connection with the required

background investigation. *Id*. at 3 (Lamb Decl. ¶ 4).

After the background investigation was complete, MCC Security Specialist Cherita

Nichols reviewed the State Department's report and noted four issues on an "Adjudications

Worksheet." *See* Dkt. 79-1 at 5 (Defs.' SUMF ¶ 13); Dkt. 77-2 at 118 (Adjudications

Worksheet).  First, she noted that Lamb had been "[r]emoved for being absent without leave"

from a job with the Naval Air Systems Command Facility on August 17, 2015.  Dkt. 77-2 at 118

(Adjudications Worksheet).  Second, she noted that Lamb had received a "[o]ne day suspension

for 'Failure to follow an instruction and to promote the efficiency of the service'" on September

22, 2014.[1]  *Id.*  Third, she noted that Lamb had a delinquent financial account related to an American Express Credit Card as of January 27, 2016.  *Id.*  And fourth, she noted that Lamb had undergone psychological treatment between April 2015 and September 2015.  *Id.*

Nichols then used a document called the "Issue Characterization Chart" to assign a "letter" to each issue to indicate the issue's seriousness.  Dkt. 79-2 at 51 (Nichols Dep. 37:1–5).  The Issue Characterization Chart ranks potential issues on a scale from "A" to "D" with "A" representing a "Minor" issue and "D" representing a "Major" issue.  *See* Dkt. 77-3 at 2–4 (Issue Characterization Chart).  The Issue Characterization Chart also provides instructions to "Upgrade[]" or "Downgrade[]" the assigned levels depending on the frequency and recency of issues.  *Id.* at 7.  Finally, the Issue Characterization Chart provides "Debarment Guidelines" that suggest appropriate periods of debarment (*i.e.*, formal ineligibility for federal employment) based on the level and recency of issues.  *Id.*

Nichols assigned Lamb's two employment misconduct issues initial grades of "B" and the delinquent credit card a grade of "A."  Dkt. 77-2 at 118 (Adjudications Worksheet); *see also* Dkt. 77-3 at 2–3 (Issue Characterization Chart).  She did not assign a level to Lamb's "psychological treatment."  She then "upgraded" the level of each of the three graded issues by three steps: one step because Lamb's job was designated as a "position risk" of "moderate risk" and two steps because "three or more issues [were] present" within 36 months.  Dkt. 79-2 at 51–52, 61–62, 64-65 (Nichols Dep. 37:21–38:8, 47:18–48:19, 50:10-51:7); *see also* Dkt. 77-2 at 118 (Adjudications Worksheet); Dkt. 77-3 at 7 (Issue Characterization Chart) (instructing the

---

[1] Nichols mistakenly noted this incident as occurring "11m" (11 months) before Lamb completed his background check paperwork, rather than about 15 months.  That mistake, however, would not have changed any of the level calculations discussed below.  *See* Dkt. 77-3 at 7 (Issue Characterization Chart).

adjudicator to raise all issues twice when there are three or more issues within 36 months). That upgrade resulted in each of the three issues being rated at the maximum seriousness of "D" or "Major." Dkt. 77-2 at 118 (Adjudications Worksheet). Finally, she "proposed" a "debarment" period of "36m" (36 months) due to the presence of "D"-level issues within 12 months before the "control date" when Lamb signed and certified his investigation forms. *See id.*; *see also* Dkt. 77-3 at 7 (Issue Characterization Chart) (recommending a 36-month debarment for "D"-level issues within 12 months before the "control date"); Dkt. 79-2 at 47 (Nichols Dep. 33:4–8) (describing the meaning of "control date"). The "Final Action," however, is listed as "unfavorable determination," rather than "agency debarment as proposed" or "referral to OPM for debarment consideration." Dkt. 77-2 at 118 (Adjudications Worksheet).

Between March 29, 2016, and April 15, 2016, Nichols and some of her colleagues exchanged several drafts of a letter addressed to Lamb from "William Barboza, Director, Domestic Personnel and Physical Security," informing Lamb that "the results" of the investigation "raise[d] a serious question as to [his] fitness [or 'suitability' in the first draft] to perform services for or on behalf of MCC." *See* Dkt. 79-2 at 271–84, 287–89. The last version of the draft that appears in the record was sent to Defendant James Blades, the Director of Lamb's department, on April 15, 2016. *Id.* at 293–94; Dkt. 79-1 at 2 (Pl.'s Response to Defs.' SUMF ¶ 3). It stated that MCC was concerned due to Lamb's "[m]isconduct or negligence in employment," and it referred to an "enclosure" that would "describe[] the specific charge(s) and a summary of the investigative information." Dkt. 79-2 at 293. It also stated that Lamb would be "given [an] opportunity to respond to these charges and [to] make any comments or explanations;" to "provide any documentary evidence, including affidavits," in support of those comments; and to "designate [a] representative" on his behalf. *Id.* Finally, the draft letter also

indicated that "MCC [would] consider all of [his] responses in reaching a decision whether to rate [him] ineligible for contractor employment in an MCC position." *Id.* at 294.

The MCC, however, never sent the letter to Lamb, and he was never provided an opportunity to rebut the concerns identified in Nichols's Adjudications Worksheet. While all of this was happening, Lamb had become antsy about the status of his background check. When he started work at the MCC he was under the mistaken impression that he already cleared the background check process. *See* Dkt. 77-2 at 115. But as Nichols explained to him shortly after he started, he was only given "an interim clearance" to start work while his "background investigation [was] ongoing." *Id*. at 116. At the same time, Nichols told Lamb that she had "received several calls from [Lamb's] case manager at [the State Department] indicat[ing] that [he] [was] refusing to cooperate with [his] ongoing investigation" or to sit for a "subject interview." *Id.* Lamb responded to Nichols, asserting "[a]t no time did I ever refuse to cooperate with anyone including 'State' regarding any on-going investigation or interview." *Id.* at 115.

In the weeks that followed, Lamb reached out several times to different MCC employees inquiring about the status of his background check. *Id.* at 113, 114, 117. According to Blades, at least three employees came to Blades with concerns about Lamb's behavior during this time, describing Lamb's behavior as "abrasive, pushy, [and] confusing" and calling Lamb "unstable." Dkt. 77-2 at 68–69 (Blades Dep. 49:12–23; 50:2–10). Nichols reported that, on one occasion, Lamb entered the "secure area" where she and Barboza worked and "stood between where both of [them] sat and he didn't say anything," an episode that Nichols described as "very concerning." Dkt. 79-2 at 37–38 (Nichols Dep. 23:20–24:17). Lamb denies that he entered the secure area "uninvited," Dkt. 79-1 at 5; Dkt. 79-2 at 8 (Lamb Decl. ¶ 23), and Nichols does "not

recall how [he] got access to the office," Dkt. 79-2 at 38 (Nichols Dep. 24:1-11).  Moreover, it is

unclear whether Nichols reported that specific incident to Blades or whether the concerns she

communicated were more general.

   In any event, Blades perceived that a problem existed for reasons above and beyond the

contents of the adjudication worksheet, and he decided that he needed to take action.  He had

been informed that there were "red flags" in Lamb's background check, *id.* at 68 (Blades Dep.

49:1–10), and he was concerned by the reports regarding Lamb's behavior.  Although perhaps an

overreaction under the circumstances, he "recall[ed]" a "situation at the Navy Yard" where

"somebody that didn't seem stable" was "ignored" by supervisors despite reported "concerns." [2]

Dkt. 77-2 at 69–70 (Blades Dep. 50:20–51:10).  Blades did not want to "be that person that

ignored somebody that was . . . unstable, pushy, abrasive," Dkt. 77-2 at 69–70 (Blades Dep.

50:20–51:10), and he decided to take immediate action to remove Lamb.

   On April 18, 2016, Blades told Sawdey's on-site representative "to meet . . . Lamb at the

front door" and to take his ID and access cards because Blades "had a concern about [Lamb's]

behavior while he was in the building."  Dkt. 79-1 at 11 (Defs.' SUMF ¶ 32).  In accordance with

those instructions, individuals who Lamb characterizes as "MCC officials" met Lamb at the door

of the MCC facility, and they confiscated his government identification and removed him from

the premises.  Dkt. 79 at 4.  This was all done without the MCC reaching a final decision on

whether Lamb's background check rendered him unfit to perform services for the MCC.  *See*

---

[2] Blades seems to be referring to an incident that took place on September 16, 2013, when a U.S.
Navy contractor employee shot and killed twelve other employees at the Washington Navy Yard.
*See* Department of Defense, Internal Review of the Washington Navy Yard Shooting, *available
at* https://perma.cc/JG9T-CCAP.

Dkt. 79-2 at 72 (Nichols Dep. 58:12–13) ("An unfavorable determination was never formally made."); *see also* Dkt. 77-2 at 58 (Barboza Dep. 32:21–22).

Lamb, however, was left under the impression that he was denied access to his workplace because he had failed his background check. He received an email from Sawdey later that day indicating that Sawdey had "received word from MCC that [Lamb's] security check came back unfavorable" and that MCC had asked Sawdey to "remove [Lamb] from the task." Dkt. 77-2 at 141. Sawdey's email also informed Lamb that Sawdey did not "currently have any other tasks in which [Lamb's] skillset w[ould] fit," and that Lamb was "therefore" "la[id] off from employment with Sawdey . . . effective immediately." *Id.*

To get to the bottom of what happened, Lamb requested "copies of all information maintained about himself" from the MCC and, when the agency failed to timely respond, he sued the MCC for the release of the records under FOIA and the Privacy Act. *Lamb II*, 334 F. Supp. 3d at 209. In conjunction with that case, the MCC and the State Department provided Lamb with the records he sought, with a few redactions. *See Lamb II*, 334 F. Supp. 3d at 210. Among those records were the Adjudications Worksheet and the MCC's draft letter setting forth the reason for the agency's unfavorable determination, which were mailed to Lamb by Assistant U.S. Attorney Jason T. Cohen on or about July 18, 2016. *See Lamb v. Millennium Challenge Corp.*, No. 16-cv-765 (Nov. 10, 2016) (Dkt. 37-1; Dkt. 37-2); *see also* Dkt. 79-1 at 12 (Defs.' SUMF ¶ 35).[3]

---

[3] As explained further below, Lamb disputes this assertion of fact as "incomplete" and adds that he was sent the Adjudications Worksheet on or around October 2018. Dkt. 79-1 at 12 (Pl.'s Resp. to Defs.' SUMF ¶ 35). He does not, however, dispute the truth of the assertion, even if "incomplete."

While the prior suit was still pending, Lamb sought leave to amend his complaint in that case to add, among other things, substantive challenges to his termination.  *See Lamb v. Millennium Challenge Corp.*, No. 16-cv-765 (Nov. 21, 2016) (Dkt. 41-1).  In *Lamb I*, the Court denied leave to amend with respect to several of Lamb's proposed claims on the ground that amendment as to those claims would have been futile.  *Lamb I*, 228 F. Supp. 3d at 39–47.  But the Court granted Lamb leave to add three due process claims against James Blades alleging that Lamb's termination violated the Fifth Amendment.  *Id.* at 42–43.  Lamb promptly filed a second amended complaint adding these claims against Blades.  *Lamb v. Millennium Challenge Corp.*, No. 16-cv-765 (Jan. 13, 2017) (Dkt. 50).  But a month later, Lamb voluntarily dropped those due process claims.  *Id.* (Feb. 15, 2017) (Dkt. 53).  Subsequently, the Court granted in part and denied in part the defendants' motion for summary judgment, *Lamb II*, 334 F. Supp. 3d 204, and, in yet another decision, denied the parties' cross-motions for summary judgment on the remaining claims, *Lamb III*, 2019 WL 4141868. The Court closed the case in January 2020, after the defendants in that case "voluntarily provided [Lamb] with the sole remaining documents in dispute."  *Lamb v. Millennium Challenge Corp.*, No. 16-cv-765 (Min. Entry Jan. 23, 2020) (entering final judgment and closing the case).

Lamb filed this new case against MCC and Blades on March 4, 2019.  Dkt. 1. Defendants responded by moving to dismiss the complaint for failure to state a claim.  Dkt. 21. The Court denied that motion with respect to Lamb's due process claims in Counts I–IV and his Privacy Act claim in Count V, but the Court granted the motion with respect Lamb's Privacy Act claim in Count VI.  *See Lamb IV*, 498 F. Supp. 3d 104.  The Court also granted Lamb leave to amend his complaint, and he did so on December 1, 2020.  Dkt. 29.  Defendants then moved to dismiss Lamb's revised Count VI and a new Count VII, Dkt. 32, and Lamb moved for leave to

file a second amended complaint, Dkt. 37.  The Court granted Defendants' partial motion to dismiss, dismissed Counts VI and VII, and denied Lamb leave to amend.  *See Lamb V*, 573 F. Supp. 3d 346.  Counts I–V of the amended complaint remain pending.  Defendants now move for summary judgment on each of those counts.

## II.  LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is capable of affecting the outcome of the litigation.  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  In considering a motion for summary judgment, the Court must resolve all factual disputes and draw "all justifiable inferences" in favor of the non-moving party.  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).

The party moving for summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial."  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting *Holcomb*, 433 F.3d at 895).  "That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must

provide evidence that would permit a reasonable jury to find in its favor." *Gentry v. McDonough*, 588 F. Supp. 3d 91, 94–95 (D.D.C. 2022) (citing *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987)).

The nonmoving party's opposition must consist of more than mere allegations or denials; the nonmoving party must proffer affidavits, declarations, or other competent evidence establishing is a genuine dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. "[T]he moving party is entitled to judgment as a matter of law if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'" *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 836–37 (D.C. Cir. 2022) (quoting *Stoe v. Barr*, 960 F.3d 627, 638 (D.C. Cir. 2020)). If the nonmoving party's evidence is "not significantly probative," the Court should grant summary judgment in favor of the moving party. *Liberty Lobby*, 477 U.S. at 249–50.

## III.  ANALYSIS

### A.    Due Process Claims

In Counts I–IV, Lamb asserts procedural due process claims. To succeed on a procedural due process claim, Lamb must first establish that he "has been deprived of a protected interest in 'liberty' or 'property'" and must then show that "the procedures used by the Government in effecting the deprivation [did not] 'comport with due process.'" *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 59 (1999)). The MCC contends that Lamb's due process claims fail at the first step because the "undisputed evidence" establishes that the MCC did not deprive Lamb of any "constitutionally protected property or liberty interests." Dkt. 77 at 14. At the motion to dismiss stage, the Court allowed Lamb's due process claims to proceed with respect to two

11

alleged interests.  First, the Court concluded that Lamb's complaint could be read "as alleging that Plaintiff had a property interest in continued employment."  *Lamb IV*, 498 F. Supp. 3d at 110.  Second, the Court held that Lamb had adequately alleged that Defendants "deprived him of a protected liberty interest by preventing him from finding work in his chosen profession," which is known as a "stigma-plus" claim.  *Id.* at 113.   Now that that the parties have conducted discovery, and Defendants have moved for summary judgment, the Court must decide whether a reasonable jury could find in Lamb's favor on either theory.  As explained below, the Court now concludes that uncontroverted facts preclude Lamb from recovering under either theory.[4]

1.    *Property Interest in Continued Employment*

At the motion to dismiss stage, the Court construed Lamb's complaint to allege that his "contract with Sawdey rendered him removable only for cause," and, as required at the motion to dismiss stage, the Court assumed the truth of that factual allegation.  *Id.* at 110.  MCC has now proffered uncontroverted evidence to the contrary, which establishes that Lamb was, in fact, employed at will.  At-will employees, as a general rule, have "no liberty or property interest in continued employment," *O'Donnell v. Barry*, 148 F.3d 1126, 1139 (D.C. Cir. 1998), and, at least as a matter of due process, "may be discharged at any time and for any reason, or for no reason at all," *Liberatore v. Melville Corp.*, 168 F.3d 1326, 1329 (D.C. Cir. 1999) (citations and quotation marks omitted).

According to the MCC, Lamb was an at-will employee and therefore had no property interest in continued employment.  In support, it proffers three pieces of evidence, each of which

---

[4] The Court uses the word "uncontroverted," rather than "undisputed," because a party opposing a motion for summary judgment must do more than register disagreement with the movant's evidentiary showing.  The non-moving party must offer evidence of its own "controverting" that evidence.

makes clear that Lamb's employment with Sawdey was at will. First, Lamb signed a "Handbook Acknowledgement" in February 2016, which affirmed:

> I further understand that I am an at-will employee with the Company and either the Company or I can terminate this employment relationship at any time for any reason.

Dkt. 77-2 at 143. Second, Lamb's Employment Agreement with Sawdey provided:

> [E]ither party may terminate [the employment] relationship at any time, with or without notice and with or without cause. As such, employment with Sawdey Solution Services, Inc. is at-will.

Dkt. 77-2 at 144. Finally, Lamb's offer letter included similar language:

> Employment At Will: Please note, employment is "at will" and this offer letter does not constitute a contract.

Dkt. 77-2 at 150.

Lamb does not meaningfully dispute that this employment at Sawday was at will.[5] Instead, he spends much of his opposition brief arguing that he was jointly employed by the MCC and Sawdey. Dkt. 79 at 9–13. The law he cites, however, involves employment discrimination cases in which the plaintiffs were seeking to recover from the government based on the premise that they were jointly employed by a private contractor and a government agency. These cases, however, have nothing to do with the due process clause, in general, or the question whether the employees had a constitutionally protected property interest in their continued employment. In an exercise of pure *ipse dixit*, however, Lamb simply declares that "if MCC was

---

[5] Lamb "dispute[s]" this assertion of fact as "incomplete," asserting that "illegal or discriminatory adverse employment actions do not constitute 'at-will' for the purpose of termination 'at-will' and any 'at will' agreement would have been under the laws of the state of Ohio." Dkt. 79-1 at 3 (Pl.'s Response to Defs.' SUMF ¶ 5). He does not assert a discrimination claim, however, nor does he explain why he invokes Ohio law or what any of this has to do with whether he had property interest—for purposes of the due process clause of the Fifth Amendment—in his employment with Sawday. And most significantly for present purposes, he offer no evidence controverting the clear, documentary evidence offered by Defendants.

a joint employer, Plaintiff is entitled to the same protection afforded to all MCC employees, much like the Title VII claimants who allege that federal agencies were joint employers." Dkt. 83 at 2. That assertion elides the settled principle that a cognizable "property interest" requires "more than a unilateral expectation" and, instead, requires "a legitimate claim of entitlement" that is "created and . . . defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576–77 (1972). Unsurprisingly, Lamb fails to identify any rule that accords at-will employees of government contractors with a legal right to continued employment by the contractor's government client. To the contrary, even government *employees* who are "terminable at will" have no property interest in their employment. *Hall v. Ford*, 856 F.2d 255, 265 (D.C. Cir. 1988). Finally, it bears note that the MCC's organic act expressly provides that personal services contractors working with the MCC are not "[f]ederal employees." *See* 22 U.S.C. § 7713(a)(8) (providing that MCC "may contract with individuals for personal services, who shall not be considered [f]ederal employees for any provision of law administered by the Office of Personnel Management").

The Court, accordingly, concludes that no reasonable jury could find, based on the record evidence, that Lamb possessed a property interest in his continued employment with Sawdey or the MCC.

### 2. *Stigma-Plus Claim*

Lamb's stigma-plus claim fares no better.[6] A stigma-plus claim requires "the combination of an adverse employment action and 'a stigma or other disability that foreclosed

---

[6] MCC argues that the Court should not reach Lamb's stigma-plus claim at all because it is not properly asserted in Lamb's amended complaint. Dkt. 77 at 15. At the motion to dismiss stage, Lamb was proceeding *pro se* and was subject to the "less stringent" standards that apply to

[the plaintiff's] freedom to take advantage of other employment opportunities.'" *O'Donnell v. Barry,* 148 F.3d 1126, 1140 (D.C. Cir. 1998) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)).  Lamb's termination qualifies as an adverse employment action, and the MCC does not argue otherwise.  Similarly, for purposes of resolving the pending motion, the Court will assume (without deciding) that the Blades's decision to prevent Lamb from entering the MCC building—based at least in part on concerns raised in Lamb's background check—also qualifies as an adverse employment action.  Lamb's claim fails, however, under the second prong of the test; based on the undisputed evidence, the Court concludes that no reasonable jury could find that Lamb has experienced a "continuing stigma or disability arising from official action." *Id*.

To prevail on a stigma-plus claim, a plaintiff must make one of two possible showings. First, he can show that "[the government's] action formally or automatically exclude[d] [him] from work on some category of future [government] contracts or from other government employment opportunities." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994). Second, "even when the government's action does not have the 'binding effect' of a formal exclusion, it may still implicate a liberty interest if it has 'the broad effect of largely precluding [the plaintiff] from pursuing [his] chosen career.'" *Campbell v. District of Columbia*, 894 F.3d 281, 289 (D.C. Cir. 2018) (quoting *O'Donnell*, 148 F.3d at 1141).  "[G]overnment defamation,

---

unrepresented litigants. *Jones v. Biden*, 2024 WL 1239727 (D.D.C. Mar. 11, 2024).  On MCC's telling, the Court allowed Lamb to "further develop" his stigma-plus claim in his opposition brief even though his complaint "does not actually assert a liberty interest due process claim based on a 'stigma plus' theory."  Dkt. 77 at 15.  But, in allowing Lamb's stigma-plus claim theory to go forward, the Court relied primarily on the allegations in Lamb's complaint to conclude that he had "alleged facts sufficient to support each element of the stigma-plus test." *Lamb IV*, 498 F. Supp. 3d at 115.  The amended complaint, which was also filed *pro se*, repeats those factual allegations, and, for the reasons the Court has previously given, those allegations suffice to *allege* a stigma-plus claim.

standing alone," however, "cannot be the basis of an 'employment foreclosure' liberty claim." *Kartseva*, 37 F.3d at 1527 (citing *Paul v. Davis*, 424 U.S. 693 (1976)).

a. Formal Exclusion

As to the first approach, Lamb fails to identify to evidence that would permit a reasonable to jury to find that the MCC—or any other government agency—has taken any action that "formally or automatically exclude[d]" him from pursuing future employment with the government. *See Kartseva*, 37 F.3d at 1528. The undisputed evidence, mroevoer, is to the contrary. First, although Lamb asserts in his declaration that he "was debarred for 36 months by the MCC," Dkt. 79-2 at 3, there is no evidence (beyond Lamb's unsupported assertion) that Lamb was, in fact, subject to an official debarment action or proceeding. Lamb points repeatedly to the Adjudications Worksheet, which listed a "length of *proposed* debarment" of "36m." *See* Dkt. 77-2 at 118. (emphasis added). Lamb, however, ignores the fact that a proposed disbarment is not disbarment, and he ignores the fact that the Adjudication Worksheet does not include an "effective date" for any disbarment and that, under the "Final Action" section, neither Nichols nor anyone else ever checked the box for "Agency Debarment as Proposed." *Id.*

But even beyond those difficulties, Lamb offers no counter to Nichols's deposition testimony, which put the lie to any suggestion that Lamb was ever disbarred. Nichols, `who prepared that document, testified that the Adjudications Worksheet provided to Lamb pursuant to his FOIA request was only a "draft" and that no one had "complete[d] an adjudication worksheet that was not a draft." Dkt. 79-2 at 58 (Nichols Dep. 44:7–9). Nichols also testified at her deposition that debarment is a process that can be taken only by the Office of Personnel Management ("OPM"), not by the MCC. *See* Dkt. 79-2 at 67, 71 (Nichols Dep. 53:4–10; 57:11–18) ("MCC doesn't have any authority as an agency to debar anyone from federal service. . . . In order for a debarment to happen, the case would have to go to OPM and OPM would have to

16

make a determination in order to debar someone from the government.").  Finally, she testified that the MCC had not even taken the "first step" toward an unsuitability determination, which would have required the agency to "issue a letter to . . . Lamb advising him that there had been an unfavorable determination," and which would have preceded any debarment referral to OPM. Dkt. 79-2 at 71 (Nichols Dep. 57:19–58:2).  In the light of that testimony and the absence of any evidence to the contrary, no reasonable jury could find that Lamb was officially debarred.

Official debarment, however, is not the only type of formal exclusion recognized by the D.C. Circuit.  A stigma-plus plaintiff can also establish a formal exclusion by showing that the agency (1) made a "binding determination" to disqualify the plaintiff from "future government work" or (2) made an unsuitability determination that would be "available to future potential government employers" and that would "automatically preclude [the plaintiff] from meeting eligibility criteria for other jobs."  *Kartseva*, 37 F.3d at 1528.  It unclear whether Lamb intends to invoke either of these theories.  He asserts only that "[t]he actions of MCC rendered [him] unemployable for federal employment," Dkt. 79 at 15, and attests that he unsuccessfully "sought employment with the MCC in the contracts department" and that Sawdey "refused to hire [him] in any other capacity or for any other government contract," Dkt. 79-2 at 4 (Lamb Decl. ¶ 9). But the fact that he was not hired for a specific job at the MCC or on other Sawdey projects does not mean that the MCC made a "binding determination" disqualifying him from "future government work" or that the agency made an "unsuitability determination" that was available to other potential government employers.  Although Lamb also asserts that these unsuccessful efforts to find work were "most likely due in party to [his] debarment from the Agency for 36 months," *id*., that inference is unsupported by the uncontroverted evidence, which—as explained

above—shows that Lamb was never debarred or even subject to a final unsuitability determination.[7]

Because Lamb's contention that he was subject to an unsuitability determination that automatically precluded him from obtaining future government employment is unsupported by any evidence that might be admitted at trial—or that might be presented in an admissible manner, Fed. R. Civ. P. 56(c)(2)—this approach to Lamb's stigma-plus claim is unavailing.

b. Preclusion from Pursuing His Chosen Career

Nor has Lamb proffered evidence sufficient to establish a triable issue of fact on the question of whether he was "largely preclude[ed] [] from pursuing [his] chosen career." *Kartseva*, 37 F.3d at 1528. The D.C. Circuit has set a high standard for a plaintiff pursuing a stigma-plus claim on this theory. To do so, a plaintiff must show that "his ability to pursue his chosen profession has been 'seriously affected, if not destroyed.'" *O'Donnell*, 148 F.3d at 1141–42. Lamb has failed to identify evidence sufficient to submit this question to a jury.

To start, Lamb never identifies his "chosen profession." Lamb states that he "was employed as an Acquisition Business Analyst, and MCC's actions have rendered him unable to gain employment in that field." Dkt. 79 at 15. But "Acquisition Business Analyst" is a job title, not a field. More importantly, the undisputed evidence demonstrates that Lamb *was* able to

---

[7] Lamb also asserts that "Blades testified that [Lamb] had been barred from current or future employment with the government." Dkt. 79-1 at 9. But Lamb does not point the Court to any statement in Blades's deposition to that effect and, instead, merely cites to his own ipse dixit assertion, Dkt. 79-2 at 10 (Lamb Decl. ¶ 34). The Court's Local Rules, and the standing order in this case, Dkt. 5, require that at the summary judgment stage parties provide "specific citations to those portions of the record upon which the party relies," Dkt. 5 at 4, and a party cannot evade that requirement by merely reproducing its statement of Response to Defendants' Statement of Undisputed Material Facts, Dkt. 79-1, as a declaration that is, itself, unsupported by any record citations. The Court will thus decline to consider Lamb's unsupported assertion that Blades testified that Lamb had been barred from current or future government employment.

obtain a job with a similar title.  Lamb admits that in 2018 he was hired by Stafford Consulting

Company as a "Sr. Acquisition and Program Specialist" supporting a government contract with

the U.S. Department of Agriculture.  Dkt. 79-1 at 12 (Defs.' SUMF ¶ 36).  He resigned from that

position within a month of starting, however, because he was "directed to use [his] personal

computer."  Dkt. 77-2 at 153.  Lamb's ability to secure another job—even one that he left soon

thereafter—belies his contention that Defendants took an adverse employment action against him

that had "the broad effect of largely precluding [him] from pursuing [his] chosen career,"

*Campbell*, 894 F.3d at 289.

*   *   *

The Court will, accordingly, **GRANT** summary judgment in favor of Defendants as to

Lamb's due process claims.

**B.**    **Privacy Act Claims**

In Count V, Lamb alleges that MCC violated the Privacy Act by relying on the

"inaccurate and incomplete" Adjudications Worksheet to terminate his employment.  Dkt. 29 at

11 (Am. Compl.).  The Privacy Act "safeguards the public from unwarranted collection,

maintenance, use and dissemination of personal information contained in agency records" by,

among other things, "imposing responsibilities on federal agencies to maintain their records

accurately."  *Bartel v. FAA*, 725 F.2d 1403, 1407 (D.C. Cir. 1984) (footnotes omitted).  The

Privacy Act requires that "[e]ach agency that maintains a system of records . . . maintain all

records which are used by the agency in making any determination about any individual with

such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure

fairness to the individual in the determination."  5 U.S.C. § 552a(e)(5).  If an agency fails to do

so, and "consequently a determination is made which is adverse to the individual," the individual

19

may sue the agency in federal district court.  *Id.* § 552a(g)(1)(C).  A plaintiff may recover damages under this provision if he establishes that the agency "acted in a manner which was intentional or willful."  *Id.* § 552a(g)(4).

Accordingly, to succeed on a claim for damages under § 552a(g)(1)(C), Lamb must prove (1) that he "has been aggrieved by an adverse determination;" (2) that MCC "failed to maintain his records with the degree of accuracy necessary to assure fairness in the determination;" (3) that the MCC's "reliance on the inaccurate records was the proximate cause of the adverse determination;" and (4) that the MCC "acted intentionally or willfully in failing to maintain accurate records."  *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996).  The MCC moves for summary judgment on Count V for two reasons:   First, the claim is barred by the statute of limitations because Lamb received a copy of the Adjudications Worksheet in connection with his prior FOIA suit in July 2016, Dkt. 77 at 19, yet did not file this action until March 2019.  Second, based on the record evidence, no reasonable jury could find that the Adjudication Worksheet was materially inaccurate, much less that any inaccuracies were intentional or willful.  *Id.* at 20–24.  Because the Court concludes that Lamb's Privacy Act claim is untimely, it need not, and will not, reach the MCC's second argument.

Subject to an exception not applicable here, the Privacy Act requires that "[a]n action to enforce any liability created under [the Act] may be brought in the [appropriate] district court . . . within two years from the date on which the cause of action arises."  5 U.S.C. § 552a(g)(5).  A claim arises when "the plaintiff knows or should know of the alleged violation."  *Tijerina v. Walters*, 821 F.2d 789, 798 (D.C. Cir. 1987).  Here, the MCC has proffered evidence that it sent

Lamb a copy of the allegedly inaccurate Adjudications Worksheet on or around July 18, 2016, [8]

in connection with Lamb's prior FOIA suit.  Most notably, that evidence includes a signed

declaration from Assistant U.S. Attorney Jason T. Cohen attesting that he mailed a copy of the

"MCC Adjudication Worksheet Grid," among other materials, to Lamb "[o]n or about July 18,

2016," *Lamb v. Millennium Challenge Corp.*, No. 16-cv-765 (Nov. 10, 2016) (Dkt. 37-1) (Cohen

Decl. ¶¶ 2–3).  Cohen further attests that he mailed these materials to the address that Lamb had

provided in connection with the FOIA matter, which is the same as the address that Lamb

provided to the Court in connection with this case; that "[a]t no time ha[d] . . . Lamb filed a

change of address notice with the court or notified [Cohen] that he receives mail at any other

location;" and that "[t]he documents mailed to . . . Lamb were not returned by the U.S. postal

service as undeliverable or otherwise."  *Id.*  Based on this evidence, the MCC posits that  "Lamb

knew or should have known of the alleged inaccuracies" in the Adjudications Worksheet "in July

2016."  Dkt. 77 at 19.

Lamb does not deny that Cohen sent him a copy of the Adjudications Worksheet in July

2016, and, instead, skirts the issue.  In its Statement of Undisputed Material Facts, the MCC

asserted that "[o]n or around July 13, 2016, [it] responded to Lamb's FOIA request with a copy

of MCC's Adjudications Worksheet."  Dkt. 79-1 at 12 (Defs.' SUMF ¶ 35).  If Lamb had reason

to doubt the truth of that assertion, he was free to deny it and to identify any controverting

evidence.  But, rather than do so, Lamb merely stated:

---

[8] In its motion for summary judgment, MCC misstates the date as July *13*, 2016.  *See* Dkt. 77 at
14.  The evidence provided, however, supports a date of July 18, 2016.  *See Lamb v. Millennium
Challenge Corp.*, No. 16-cv-765 (Nov. 10, 2016) (Dkt. 37-1) (Cohen Decl. ¶¶ 2–3) (declaring
that Cohen had sent documents, including the "Adjudication Worksheet Grid," to Lamb "[o]n or
about July 18, 2016); *id.* (Dkt. 37-2) (cover letter addressed to Lamb dated July 18, 2016).

> Disputed as incomplete.  On or around October 2018 the MCC responded to
> Plaintiff's request with a copy of the MCC's Adjudication Worksheet.  Pl's Ex.
> A at ¶ 45.

Dkt. 79-1 at 12 (Pl.'s Resp. to Defs.' SUMF ¶ 35).  There is, of course, a significant difference

between disputing as an assertion as false and disputing it as "incomplete."  It is false to say that

the sun rises in the west, while is it merely incomplete to assert that the sun rises.  Nor is there

any doubt that Lamb understands this distinction; he disputes the MCC's contention that the

MCC, through counsel, sent him the Adjudication Worksheet on July 13, 2016 as "incomplete,"

Dkt. 79-1 at 12 (Pl.'s Resp. to Defs.' SUMF ¶ 35), while he opposes several other purportedly

undisputed facts as "false," *see id*. at 4–5, 9–12 (Pl.'s Resp. to Defs.' SUMF ¶¶ 8, 111, 23, 25–

32, 34).  Lamb adds to his response that, "[o]n or around October 2018, the MCC responded to

Plaintiff's request with a copy of the MCC's Adjudication Worksheet."  *Id.* at 12 (Pl.'s Resp. to

Defs.' SUMF ¶ 35).  Both things, however, can be true—that is, that he received copies of the

worksheet in July 2016 *and* in October 2018—and, as a result, challenging the MCC's assertion

as "incomplete" says nothing about the truth of the Cohen declaration.

In opposing a motion for summary judgment, moreover, the non-moving party bears the

burden of proffering evidence sufficient to controvert the evidence proffered by the moving

party.  Here, however, Lamb offers no evidence that even arguably calls into question the

veracity of the Cohen declaration or the validity of the inference that he received what was

mailed to him at his address of record.  He has not submitted a declaration, for example, attesting

that he moved to a different address, that his mail delivery was spotty, or simply that he never

received the July 2016 mailing.  Instead, he submits a declaration that, once again, merely tracks

his response to Defendants' statement of undisputed facts.  Dkt. 79-2 at 11-12 (Lamb Decl. ¶ 45).

He attests:

> With respect to Defendants' Undisputed Fact No. 35 it [sic] their Motion for Summary Judgment, I dispute the fact as incomplete. On or around October 2018, the MCC responded to my request with a copy of the MCC's Adjudication Worksheet.

Dkt. 79-2 at 11–12 (Lamb Decl. ¶ 45). For the reasons explained above, however, none of this controverts the MCC's evidence that Lamb received a copy of the worksheet in July 2016.

As a result, the uncontroverted evidence establishes that Lamb did not bring this action within two years of when he learned about the alleged violation of the Privacy Act. Notably, his Privacy Act claim turns on the contention that the Adjudications Worksheet contained material inaccuracies. The uncontroverted evidence, moreover, establishes that Lamb received a copy of that very document in July 2016, over 31 months before he instituted this action. And although Lamb suggests that the Adjudications Worksheet did not include all of the information relevant to his case—and that, as a result, the MCC's assertion that Cohen mailed Lamb a copy of the worksheet in July 2016 is "incomplete"—he never identifies any additional information that he did not receive until October 2018, and that would have been necessary to put him on notice of the "alleged violation." *Tijerina*, 821 F.2d at 798. The Court thus concludes that the undisputed evidence shows that Lamb's Privacy Act claim arose in July 2016, when Lamb was sent the Adjudications Worksheet, and that the statute of limitations expired two years later in July 2018. Lamb's Privacy Act claim was therefore untimely when this action was filed in March 2019.

The Court will, accordingly, GRANT summary judgment in favor of the MCC on Lamb's Privacy Act claim.[9]

---

[9] As far as the Court can discern, Lamb does not name Blades as a defendant in Count V of his amended complaint. But, to the extent the Court is mistaken, Lamb's Privacy Act claim against Blades is also untimely and must be dismissed for that reason—among others.

**CONCLUSION**

For all these reasons, the Court will **GRANT** Defendants' motion for summary judgment, Dkt. 77.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  April 4, 2025